## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JANINE DONALDSON and<br>KIMBERLY MCKENZIE,<br><br>Plaintiffs,<br><br>v.<br><br>RONALD LENSBOUER<br>and SOMERSET COUNTY,<br><br>Defendants. | )<br>)<br>) CIVIL ACTION NO. 15-63<br>)<br>) JUDGE KIM R. GIBSON<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

I.      **Introduction**

Pending before the Court is a motion for summary judgment (ECF No. 41) filed by

Defendant Somerset County, with respect to the claims asserted against it in the amended

complaint filed by Plaintiffs Janine Donaldson and Kimberly McKenzie (ECF No. 13). Plaintiffs

are former employees of the Somerset County jail. As it relates to the County, their amended

complaint alleges claims for hostile work environment and retaliation under Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the Pennsylvania

Human Relations Act, 43 P.S. §§ 951-963 ("PHRA"), and a claim under 42 U.S.C. § 1983 for a

violation of their right to bodily integrity.[1] The motion has been fully briefed (ECF Nos. 42, 46,

50) and is ripe for disposition. For the reasons that follow, the motion will be granted in part

and denied in part.

---

[1] Ronald Lensbouer is also named as a Defendant. He has not filed a motion for summary judgment of his own or joined in the County's motion.

## II.    Jurisdiction and Venue

The Court has jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1343. Venue is proper under 28 U.S.C. § 1391(b).

## III.    Factual Background

### A.    Donaldson

Donaldson began working as a part-time corrections officer ("CO") at the jail in 2009. (ECF No. 43 ¶¶ 1, 4). She became full-time on May 15, 2010, and the following January, she began working the 8:00 p.m. to 4:00 p.m. shift. (*Id.* ¶¶ 5, 7). The chief CO during that shift was Ronald Lensbouer. (*Id.* ¶ 8). Before she became a full-time CO, Donaldson had met Lensbouer in passing and had no problems with him. (*Id.* 43 ¶ 10). But sometime after Donaldson started working full-time (she does not specifically remember when), Lensbouer began making inappropriate comments to her. (*Id.* 43 ¶ 11). The comments were "[u]sually regarding [her] boobs," and eventually became "an everyday occurrence." (Donaldson Dep. at 68:11, 84:18-21, ECF No. 44-1; ECF No. 43 ¶ 14). On one occasion, Lensbouer said something about Donaldson's "ass and he said, don't worry, I like fat asses; my wife's ass is fat." (Donaldson Dep. at 84:11-12, ECF No. 44-1).

At first, Donaldson brushed off the comments. (ECF No. 43 ¶ 13). Later, however, she started to tell Lensbouer "that's enough." (*Id.* ¶ 16). In response, Lensbouer would laugh and say things like, "Oh, we're friends. We're just friends." (Donaldson Dep. at 81:11-12, ECF No. 44-1). Donaldson could not recall anyone else at the jail besides Lensbouer making inappropriate comments to her. (ECF No. 43 ¶ 17).

Sometime in the middle of 2012, Lensbouer's conduct started to become physical. (*Id.* ¶

23). As Donaldson described it:

> I remember times that I would be – we had a book in the control room that we had to fill out whenever an inmate c[a]me in or left. I'd be over the filling it out and he'd walk past me, behind me, between me and my desk and his left hand would come – left or right, whatever way he was would, would just come right across my backside.
>
> Or if I was sitting at the control … If I would turn around and be watching the cameras or the board, he'd come and sit beside me. If somebody would call a door, we had to push the button for the doors to be opened from the control room. Well, he'd act like he was pushing one of the doors and come up and take his right hand right across my chest and try to press the doors.

(Donaldson Dep. at 90:19-24 – 91:1-11, ECF No. 44-1). According to Donaldson, this type of conduct happened "[a] lot," i.e., "[a] couple times a week." (*Id.* at 91:13, 91:18). "There was never a day that I worked with him that something … was not said or [done]," she testified. (Donaldson Dep. at 91:25 – 91:1-2, ECF No. 44-1).

The most significant incident occurred in November 2012. Donaldson was working in the control room when Lensbouer approached her and "[b]acked [her] up against the wall." (*Id.* at 86:2). Then he "[t]ook his right and put it down the back of [her] pants." (*Id.* at 86:2-3). Donaldson does not "remember if [Lensbouer's hand] was under [her] underwear or over it[,]" but she does recall that his hand "was so far down that it was past the anal part …"(*Id.* at 86:9-13). After Lensbouer put his hands down her pants, Donaldson pushed him away and left the room. (ECF No. 43 ¶ 25).

Before this incident, Donaldson had not reported any of Lensbouer's conduct to anyone at the jail or anyone outside the jail, including her husband. (*Id.* ¶¶ 26, 29-31). Sometime in either late December or early January, however, she told the jail's warden, Gregory Briggs, about the incident in the control room. (*Id.* ¶ 32). After Donaldson reported the incident to

Briggs, she had no further contact with Lensbouer. (*Id.* ¶¶ 39-40). On April 4, 2013, she resigned from the jail, and returned to her former job. (*Id.* ¶ 42).

Donaldson testified that she sought medical treatment following Lensbouer's harassment. (ECF No. 47 ¶ 340). Specifically, she was referred to Victim's Services by the Somerset Borough Police Department and attended counseling sessions with Marlene Suto-Walters and Heather Hay at Mary Berge & Associates between March and August 2014. (*Id.* ¶¶ 351-53).

**B. McKenzie**

McKenzie began working as a CO in 2001. (ECF No. 43 ¶ 47). In 2010, Lensbouer started making comments about McKenzie's physique, saying things like "[s]how me your tits. Give me a shot. Nice ass." (*Id.* ¶ 54). As McKenzie put it, the comments were "[c]onstantly about the boobs" and occurred on a "nonstop" basis – "three or four times one day, and twice the next …." (*Id.* ¶¶ 54, 60). In the beginning, McKenzie never told Lensbouer to stop, but she did say things like, "'You're disgusting' or 'that's not funny.'" (McKenzie Dep. at 111:6-7, ECF No. 44-4). She considered the comments offensive. (*Id.* at 111:18). However, she never reported them to anyone. (ECF No. 43 ¶ 78).

In early 2011, Lensbouer's behavior toward McKenzie turned physical. (*Id.* ¶ 66). On an unspecified date in 2011, Lensbouer reached from behind McKenzie and felt her breast. (*Id.* ¶ 67). Following this incident, McKenzie did not say anything to Lensbouer; she just moved away. (*Id.* ¶ 68). Nor did she report this incident to anyone at the jail. (*Id.* ¶ 80). In the ensuing months, Lensbouer touched McKenzie's breasts or backside approximately once every two weeks or a couple of times per month. (*Id.* ¶ 69). In May 2012, Lensbouer told McKenzie "I love you,"

which prompted her to tell him to stop. (McKenzie Dep. at 114:4-8, ECF No. 44-4).

In December 2012, Lensbouer stuck his hands "[v]ery, very low" down the back of McKenzie's pants and "pulled [her] underwear clear up" while the two were alone in the control room. (*Id.* at 147: 13-14). McKenzie kicked Lensbouer in the leg to get him to back away. (ECF No. 43 ¶ 75). She did not immediately report this incident, however. (*Id.* ¶ 83). On January 4, 2013, McKenzie was interviewed as part of the investigation into Donaldson's allegations, and she informed Briggs and Deputy Warden Adele Bauer about her problems with Lensbouer, including the incident in the control room. (*Id.* ¶ 84).

Like Donaldson, McKenzie was referred to Victim Services by the Somerset Borough Police Department. From there, she was referred to Mary Berge & Associates, where she received counseling from August 2013 until March 2014. (ECF No. 47 ¶ 344). Since the alleged harassment, she has experienced anxiety, panic attacks, and depression and started taking Xanax and Effexor. (*Id.* ¶¶ 341, 343).

C.    **The County's Response**

After receiving the report from Donaldson, Briggs removed Lensbouer from his duties as a chief CO and moved him to the second floor of the jail to try to separate him from Donaldson and McKenzie, who worked on the first floor. (ECF No. 43 ¶ 136). Briggs then began an investigation, during which he interviewed all of the jail's female staff members to determine whether they had any similar experiences with Lensbouer. (*Id.* ¶ 131). Aside from McKenzie, no other female staff members came forward. Briggs also interviewed Lensbouer, who "admitted that [he and Donaldson] were horseplaying and [that] they did that all the time." (Bauer Dep. at 60:5-9, ECF No. 44-13). He also admitted to giving "wedgies" to both Plaintiffs, which he

described as "a brother-sister [thing]." (Briggs Dep. at 65:15, ECF No. 44-14).

On January 11, 2013, Briggs removed Lensbouer from his chief duties until March 4, 2013, and directed him to attend the County's sexual harassment course. (ECF No. 43 ¶ 140). According to the County, this was considered a "last chance" for Lensbouer. (*Id.* ¶ 141). Sometime thereafter, the Somerset Borough Police Department began its own investigation of Lensbouer's conduct. (ECF No. 43 ¶ 142; ECF No. 47 ¶ 337). At that point, Lensbouer was moved to a different shift from McKenzie. (Donaldson had already resigned). Eventually, Lensbouer was charged with indecent assault and other crimes stemming from the incidents with Plaintiffs. (ECF No. 47 ¶ 338). Thereafter, he was placed on administrative leave. (ECF No. 43 ¶ 143). He later resigned.

### D. Alleged Harassment of Other Female Jail Employees

#### 1. JoAnn Rheel

Rheel worked at the jail in 2010 and 2011 as a part-time CO. (ECF No. 43 ¶ 162). During that time, Lensbouer made what Rheel described as "snide" comments to her. (ECF No. 43 ¶ 164). He would also stare at her breasts and tell her that her nipples looked like "snuff cans." (ECF No. 47 ¶ 224). Rheel also overheard Lensbouer make comments about other female employees' breasts. Rheel testified that Lensbouer's comments made her feel dirty, and she eventually quit working at the jail because she felt uncomfortable. (ECF No. 47 ¶ 225-26). However, she did not report Lendsouer's conduct. (ECF No. 43 ¶¶ 166, 168).

#### 2. Alice McCartney

McCartney worked as a nurse at the jail from September 2006 until August 12, 2012. (ECF No. 43 ¶ 171). On unspecified dates during that time period, Lensbouer told McCartney

that she was beautiful and that he wanted to have a relationship with her. (*Id.* ¶ 173). On one occasion, he asked to see her breasts. (*Id.* 43 ¶ 174). McCartney did not report this incident to anyone. (*Id.* ¶ 175).

### 3. Jessica Rogers

Rogers worked at the jail from October 2007 to March 2010, during which time Lensbouer made comments about her breasts "two or three times." (ECF No. 47 ¶ 228). He referred to Rogers' breasts as "knockers," and commented about their size. (*Id.* ¶ 229). Rogers also alleged that Lensbouer once pinched her buttocks and would make sexually charged comments about other women on a daily basis in her presence. (*Id.* ¶ 232).

### 4. Darryl Marker (née Maust)

Marker worked part-time at the jail for two-and-a-half years, before leaving in 2011. (ECF No. 43 ¶ 193). A few months into her employment, Lensbouer began making comments about her breasts and grabbing her breast and buttocks. (*Id.* ¶ 195). Marker testified that Lensbouer groped her approximately six times per week. (*Id.* ¶ 197). During one incident, he placed Marker's hand on his crotch. (ECF No. 47 ¶ 239). Toward the end of Marker's employment at the jail, Lensbouer allegedly cornered her in the property room and asked her to remove her shirt. (ECF No. 43 ¶ 198). She refused, so Lensbouer grabbed her by the arm and pulled her back into the room, attempting to forcibly remove her shirt. (*Id.* ¶¶ 199, 200).

The next day, Marker told her then-fiancé, Scott Marker, about the incident. (ECF No. 43 ¶ 201). Scott Marker reported the incident to his brother, Jimmy Marker, who was a County commissioner at the time. (*Id.* ¶ 202). Jimmy Marker, in turn, reported the incident to the jail's then-warden, Tom Perrin. (*Id.*). Soon thereafter, a meeting was held between Darryl Marker;

Vince Pavic, who was in charge of human resources at the jail; Bauer; and Perrin. (*Id.* ¶ 203).

An investigation ensued, with Darryl Marker and Lensbouer both submitting written statements to the warden. (ECF No. 47 ¶ 250). In her statement, Darryl Marker described Lensbouer's comments, the incident when he placed her hand on his crotch, and the incident in the property room. (*Id.* ¶ 251). During the investigation, Perrin also spoke with Jessica Rogers, who described the comments Lensbouer had made to her while she worked at the jail and also prepared a written statement. (*Id.* ¶ 254). Lensbouer was questioned, as well. (*Id.* ¶ 256). He admitted that he made sexual remarks to Marker on multiple occasions and that he had asked to see her breasts. (ECF No. 43 ¶ 206; ECF No. 47 ¶ 257). However, he denied touching her. (ECF No. 43 ¶ 211).

Following the investigation, Perrin determined "that no basis in fact of this alleged claim could be corroborated either by verbal testimony, written reports or recorded video." (ECF No. 48-12 at 2). Nonetheless, Perrin issued a written reprimand to Lensbouer for violating the County's Harassment/Sexual Harassment policy based on his admission "that on one occasion [he] expressed verbal commentaries about an individual's body." (*Id.*). The reprimand was to remain in Lensbouer's personnel file for 90 days. (*Id.* at 3). In conjunction with the reprimand, Lensbouer was ordered to attend the County's next scheduled sexual harassment training, which was supposed to take place on March 26, 2010. (*Id.* at 2). However, Lensbouer never attended the class because it was cancelled and never rescheduled. (ECF No. 47 ¶ 283). No one at the jail ever followed up with Lensbouer about the class. (*Id.* ¶ 285). Even after she reported the incident, Marker continued, at times, to work the same shifts as Lensbouer. (*Id.* ¶ 288). Marker made a few complaints about that, which she believes were not taken seriously. (*Id.* ¶

289).

Aside from the disciplinary report, there are no other records about the investigation into Marker's complaint is Lensbouer's file – even though Pavic, who was the HR director from 2005 to 2012, testified that such records typically would be kept "indefinitely." (ECF No. 47 ¶¶ 293, 296-97). Briggs, who became warden in July 2011, has never seen the statements prepared by Lensbouer, Rogers, or Marker during the investigation. (*Id.* ¶ 295).

### E.    The County's Sexual Harassment Policy

Throughout relevant time period,[2] the County promulgated a Sexual Harassment Policy, which proscribed "discrimination or harassment on the basis of race, color, religion, sex, sexual orientation, age, disability, marital status, citizenship or any other characteristic protected by law." (ECF No. 43 ¶¶ 102-03). The Policy defined sexual harassment as:

> [u]nwelcome sexual advances, requests for favors and other verbal or physical conduct of a sexual nature when, for example: (a) submission to such conduct is made either explicitly or implicitly a term or condition of an individuals [sic] employment; (b) Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or (c) such conduct as the purpose or effect of unreasonably interfering with an individuals work performance or creating an intimidating, hostile or offensive working environment.

(ECF No. 44-6 at 2).

The policy "encourage[d] reporting of all perceived incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position." (*Id.* at 4). It also instructed individuals who believed that they had been the victim of such conduct to "discuss

---

[2] In December 2011, Warden Brigg instituted a new Sexual Harassment Policy for the jail. Although the County makes reference to this policy, it has not included a copy in its appendix. Thus, it is not clear whether or how this policy differed from the County-wide policy that was applicable to the jail's employees prior to the implementation of the new jail-specific policy in 2011.

their concerns with their immediate Department Director or the Director of Human resources."

(*Id.*) In addition, the policy encouraged victims of harassment "promptly to advise the offender that his or her behavior is unwelcome and request that it be discontinued." (*Id.*) The policy provided for both informal and formal complaint procedures. (*Id.*). The informal complaint procedure provided as follows:

> If for any reason an individual does not wish to address the offender directly, or if such action does not successfully end the offensive conduct, the individual should notify his/her immediate supervisor, Warden, or the Director of Human Resources, who may, if the individual so requests, talk to the alleged offender on the individual's behalf. In addition, there may be instances in which an individual seeks only to discuss matters with one of the County's designated representatives, and such discussion is encouraged.
>
> An individual reporting harassment, discrimination or retaliation should be aware, however, that Somerset County may decide it is necessary to take action to address such conduct beyond an informal discussion. This decision will be discussed with the individual. The best course of action in any case will depend on many factors and, therefore, the informal procedure will remain flexible. Moreover, the informal procedure is not a required first step for the reporting individual.

(*Id.*).

The formal complaint procedure, on the other hand, could be triggered by a complaint to the victim's "immediate supervisor, Department Director, or the Director of Human Resources." (*Id.*). Under the policy, any such reports were to "be investigated promptly." (*Id.* at 5). The investigation could "include individual interviews with the parties involved and, where necessary, with individuals who may have observed the alleged conduct or may have other relevant knowledge." (*Id.* at 6).

The County also had an Employee Handbook that addressed its Sexual Harassment Policy. (ECF No. 43 ¶ 113). The Handbook, like the Policy itself, "strongly urg[ed] the reporting

of all incidents of harassment regardless of the offender's identity or position." (ECF No. 44-7 at 7). Individuals who were subjected to harassment were directed to "report it immediately to their immediate supervisor, Elected Official, Department Head, Human Resources Director, or department chain of command as appropriate." (*Id.*). The County's Human Resources Director was then charged with conducting an investigation of the alleged harassment. (*Id.*).

Upon her hiring in 2009, Donaldson was required to review the jail's policies, including the Sexual Harassment Policy that was in place at the time. (ECF No. 43 ¶¶ 117-18). According to her deposition testimony, she understood that under the policy a victim of harassment could report the harassment to any of her supervisors. (*Id.* ¶ 119). She also testified that she received a copy of the Employee Handbook when she was hired. (*Id.* ¶120). For her part, McKenzie testified that she believes that the County had a sexual harassment policy, but she does not recall having seen it. (*Id.* ¶ 121).

IV.     **Procedural History**

Plaintiffs initiated this action by filing a complaint against Lensbouer and the County on March 11, 2015. (ECF No. 1). In response, the County filed a motion to dismiss (ECF No. 7), while Lensbouer filed an answer (ECF No. 11). On June 5, 2015, Plaintiffs filed an amended complaint, which remains the operative pleading. (ECF No. 13). In Counts I and II, respectively, they allege a hostile work environment claim and a retaliation claim against the County. In Count III, they allege a § 1983 claim against Lensbouer, in his individual capacity, and in Count IV, they allege a § 1983 claim against the County. On January 20, 2017, the County filed its motion for summary judgment as to Counts I, II, and IV. (ECF No. 41).

## V.        Standard of Review

Summary judgment is appropriate when the moving party establishes that "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015) (quoting FED. R. CIV. P. 56(a)). A genuine issue of material fact is one that could affect the outcome of litigation. *Mahoney v. McDonnell*, 616 F. App'x 500, 504 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)). However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine issues. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Id.* (citing *Matsushita*, 475 U.S. at 587). When considering the parties' arguments, the Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)). Further, the benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Id.* (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatories to demonstrate

the existence of a genuine issue. *Connection Training Servs. v. City of Philadelphia*, 358 F. App'x 315, 318 (3d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 324).

## VI.    Discussion

### A.    Hostile Work Environment

Under Title VII, an employer cannot "'discharge … or … discriminate against any individual with respect to … compensation, terms, conditions, or privileges of employment because of such individual's … sex.'" *Huston v. Procter & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (quoting 42 U.S.C. § 2000e–2(a)(1)). "[T]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal citations, quotation marks, and brackets omitted). "Thus, '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated.'" *Id.* (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993); some internal quotation marks omitted).

"To succeed on a hostile work environment claim, the plaintiff must establish that 1) [she] suffered intentional discrimination because of [her] sex, 2) the discrimination was severe or pervasive,[3] 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination

---

[3] The County's brief is replete with references to the "pervasive and regular" standard that the Third Circuit used to employ in hostile work environment cases. However, as the Third Circuit has since recognized, "the Supreme Court's standard is 'severe *or* pervasive.'" *Jensen*, 439 F.3d at 449 n.3 (citing *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004); *Morgan*, 536 U.S. at 116; *Harris*, 510 U.S. at 21; *Meritor*, 477 U.S at 67. "The difference is meaningful, and the Supreme Court's word controls[.]" *Id.*

would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (quoting *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). "The first four elements establish a hostile work environment, and the fifth element determines employer liability." *Id.*

The County does not contest that the alleged conduct was directed toward Plaintiffs because of their sex. They do, however, argue that the remaining requirements of the *prima facie* case cannot be met. These requirements will be addressed *ad seriatim*.

### 1. "Severe or Pervasive" Conduct

Title VII is not "a generalized 'civility code.'" *Jensen*, 435 F.3d at 451 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). Thus, "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (alteration in original) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). In determining whether the alleged conduct is actionable under Title VII, the Court must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. None of these factors is dispositive; instead, "the analysis must focus on the 'totality of the circumstances.'" *Jensen*, 435 F.3d at 451-52 (quoting *Andrews*, 895 F.2d at 1482). Moreover, "[t]he disjunctive phrasing means that 'severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other,

less objectionable, conduct will contaminate the workplace only if it is pervasive." *Id.* 449 n.3 (citation and quotation marks omitted). In view of that standard, courts have held that "[a] single incident of contact with an intimate body part is sufficient to establish a hostile work environment claim." *Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 656 (E.D. N.Y. 2015) (citation omitted).

The evidence of record shows that between an unspecified date in 2010 and December 2012, Lensbouer engaged in the following conduct towards Plaintiffs: (1) beginning sometime in 2010, he made comments to Donaldson nearly every day, "usually about [her] boobs[;]" (2) he would say things like "[s]how me your tits[,] [g]ive me a shot[,] and [n]ice ass" to McKenzie "nonstop" and "[c]onstantly" say things about her breasts; (3) he told McKenzie that he loved her sometime in 2011; (4) on an unspecified date in 2011, he felt McKenzie's breast; (5) in the ensuing months, Lensbouer would touch McKenzie's breasts or backside approximately once every two weeks or a couple of times per month; (6) starting in 2012, he would brush up against Donaldson's chest and backside and sit beside her in the control room "[a] couple times a week;'" (7) in November 2012, he put his right hand down Donaldson's pants; and (8) in December 2012, he approached McKenzie, put his hands down her pants, and pulled her underwear up.

Considered on the whole, a reasonable jury could find that this conduct created a hostile work environment. To be sure, the verbal harassment and relatively minor physical touching (e.g., the brushing up against Donaldson's chest and backside) that occurred between 2010 and late 2012 do not, on their own, rise to the level necessary to establish a hostile work environment. *See, e.g., Jankowski v. Sage Corp.*, No. 08–CV–770, 2010 WL 1253544, at *1–2 (W.D.

Pa. Feb. 23, 2010) (supervisor's twice placing his hands on plaintiff's shoulder and back and rubbing; four instances of brushing up against plaintiff; and making sexual comments in one conversation were not severe and pervasive); *Bonora v. UGI Utils., Inc.*, No. 99–CV–5539, 2000 WL 1539077, at \*4 (E.D. Pa. Oct. 18, 2000) (concluding that the employee's conduct, including staring at the plaintiff's chest, touching her hand, brushing his buttocks against hers, and touching her waist, was not severe or pervasive). However, when considered alongside the incidents in November and December 2012 when Lensbouer reached down Plaintiffs' pants and grabbed their underwear, the conduct takes on a whole different tenor. As the Seventh Circuit has explained, "'direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment.'" *Patton v. Keystone RV Co.*, 455 F.3d 812, 817 (7th Cir. 2006) (quoting *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001)). In this Court's view, this type of conduct, under the circumstances in which it occurred here, cannot be equated to a pat on the backside or a squeeze of the shoulder.

*Patton* offers an apt analogy: the perpetrator of the harassment in that case "ran his hand all the way up [the plaintiff's] inner thigh, under her shorts until he touched her underwear." *Id.* at 817. In reversing the district court's grant of summary judgment for the defendant, the Seventh Circuit distinguished this conduct from the type of "middle of the road" conduct it had determined was not actionable harassment in other cases (e.g., a pat on the leg or an arm around the waist):

> The record establishes that [the perpetrator's] hand was under [the plaintiff's] shorts, on her inner thigh, and touching her underwear. If [the perpetrator] touched her vagina, then his conduct would constitute not only actionable sexual harassment but possibly criminal sexual assault as well. But even if he did not go that far, viewing the facts in the light most favorable to [the plaintiff], [the

perpetrator's] hand was on [the plaintiff's] inner thigh, under her shorts, and very near her vagina. We have no difficulty describing that as contact with an "intimate body part" …

Putting aside the definition of "intimate body part," this intentional physical intrusion in such close proximity to the most intimate areas of a person's body cannot be disregarded as a "pedestrian annoyance." *Hostetler*, 218 F.3d at 808. Nor is it the sort of middle-of-the-continuum physical contact we have held insufficient in isolation to constitute a hostile environment.

*Id.* The court went on to note that groping the plaintiff "under her shorts might be sufficient alone to create an abusive working environment." *Id.* "But it was not the sole act," the court added, and when considered alongside the evidence of other harassing behavior (the perpetrator raised a rumor of an affair between himself and the plaintiff, leered at the plaintiff obsessively, and exploited his managerial position to touch her on three occasions), a reasonable jury "easily" could have concluded that the plaintiff had experienced a hostile work environment.

So, too, here. To be sure, a fact finder might conceivably view the incident as Lensbouer described it – the type of stuff that siblings engage in. But this conduct could also reasonably be viewed as the culmination of nearly two years' worth of inappropriate comments and nearly a years' worth of inappropriate touching that occurred on a regular basis, by an individual who had previously been investigated for engaging in similar conduct and received what amounted to a smack on the wrist. Ultimately, it will be up to the jury to decide.

The County spends much of its brief attempting to liken the facts of this case to those in *Bumbarger v. New Enterprise Stone & Lime Co., Inc.*, 170 F. Supp. 3d 801 (W.D. Pa. 2016), a case in which this Court granted summary judgment to the defendant, in part, because the harasser's conduct was not "severe or pervasive." The facts here, however, are distinguishable from those

in *Bumbarger*. In that case, the plaintiff could identify "only one instance where [the alleged harasser] grabbed [her] after she placed a paint can on the floor of a truck and one instance where [he] squeezed [her] shoulder and asked if they were okay." *Id.* at 832. There was also evidence that the alleged harasser had "mooned" the plaintiffs. *Id.* at 833. By contrast, the physical contact here, which involved Lensbouer reaching far down Plaintiffs' pants and grabbing their underwear, is far more egregious. Thus, the Court finds the County's extensive reliance on *Bumbarger* to be misplaced.

### 2. Effect on the Plaintiffs

"[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris*, 510 U.S. at 21–22. To satisfy this element, however, a plaintiff need not produce evidence of "concrete psychological harm." *Id.* at 22. As "long as the environment … is perceived" to be "hostile or abusive … there is no need for it also be psychologically injurious." *Id.* Still, "[t]he effect on the employee's psychological well-being is [] relevant to determining whether the plaintiff actually found the environment abusive." *Id.* at 23.

Plaintiffs have adduced enough evidence to create a triable issue about whether they perceived the environment to be hostile or abusive. While they initially seemed to have attempted to tolerate Lensbouer's behavior, they each eventually told him to stop, and there is evidence that they sought or are still seeking treatment for the lingering effects of what transpired. This evidence is sufficient to satisfy this element at this stage.

### 3. Objective Severity

"[T]he objective severity of harassment should be judged from the perspective of a

reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 523

U.S. at 81 (quoting *Harris*, 510 U.S. at 23). "The objective standard protects the employer from

the 'hypersensitive' employee, but still serves the goal of equal opportunity by removing the

walls of discrimination that deprive a protected group member of self-respecting employment."

*Syed v. YWCA of Hanover*, 906 F. Supp. 2d 345, 357 (M.D. Pa. 2012).

Based on the evidence presented, a jury could find that a reasonable person in Plaintiffs'

position would feel that the alleged conduct was severe or pervasive enough to have altered the

conditions of her work environment.

### 4.     Employer Liability

"[T]he basis of an employer's liability for hostile environment sexual harassment

depends on whether the harasser is the victim's supervisor or merely a co-worker." *Huston*, 568

F.3d at 104. Plaintiffs "agree [that] Lensbouer was not [their] supervisor for Title VII purposes."

(ECF No. 46 at 5 n.1). Thus, the County can be held liable only if it "failed to provide a

reasonable avenue for complaint or, alternatively, if [it] knew or should have known of the

harassment and failed to take prompt and appropriate remedial action." *Huston*, 568 F.3d at 104

(citing *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001)). Put another way, "an employer

may be directly liable for non-supervisory co-worker sexual harassment only if the employer

was negligent in failing to discover the co-worker harassment or in responding to a report of

such harassment." *Id.* at 104–05. Plaintiff argues that they can impose liability on the Country

through both methods.

### a.     Reasonable Avenue for Complaint

While Plaintiffs refer to the lack of a "reasonable avenue for complaint," their argument

actually focuses on something slightly different. Specifically, they contend that their "decision to delay reporting Lensbouer was entirely reasonable" because, in light of the County's response to the Darryl Marker incident and the perceived conflicts of interest between Perrin and Bauer and Lensbouer, they believed that the County would ignore their complaints (ECF No. 46 at 18) (discussing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93 (2d Cir. 2010)). They further argue that their concerns were shared by other female County employees (i.e., Rheel and Rogers). However, because this case involves alleged co-worker harassment, Plaintiffs need not prove that their conduct was reasonable; that inquiry is relevant to the second prong of the *Faragher/Ellerth* affirmative defense,[4] which applies in cases involving harassment by supervisors. *See Faragher*, 524 U.S. at 807. What Plaintiffs must show is that the County failed to provide a reasonable avenue of complaint. This is akin to the inquiry required by the first element of the *Faragher/Ellerth* defense, though, unlike under *Faragher/Ellerth*, the burden is on the Plaintiffs to show that the County's procedures were not reasonable.

"'Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has'" provided a reasonable avenue for complaint. *Fornah v. Cargo Airport Servs., LLC*, No. 12-CV-3638 RER, 2014 WL 25570, at *8 (E.D. N.Y. Jan. 2, 2014) (quoting *Wahlstrom v. Metro–North Commuter R.R.*, 89 F. Supp. 2d 506, 523 (S.D.N.Y. 2000)). "Where an employer has promulgated a sexual harassment policy and informs all employees of its contents, such procedures will generally be

---

[4] The *Faragher/Ellerth* defense "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Cardenas v. Massey*, 269 F.3d 251, 266 (3d Cir. 2001) (citation and quotation marks omitted). The burden of proof as to each element is on the defendant.

deemed adequate, so long as employees are capable of invoking the process to enforce the policy." *Id.*

In this case, it is undisputed the County had a Sexual Harassment Policy in place during the relevant time period, which provided both formal and informal procedures for making complaints of harassment. While Plaintiffs take issue with the efficacy of the County's anti-harassment policy, they have not adduced sufficient evidence to create a triable issue as to whether the channels made available to them were unreasonable. Accordingly, this means of establishing employer liability has not been satisfied.

### b. Knowledge and Remedial Action

As already explained, the County can also be held liability "if [it] knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Huston*, 568 F.3d at 104.

The County argues that it is insulated from liability because "as soon as [Plaintiffs] reported issues with [Lensbouer] it is undisputed that Warden Briggs initiated an investigation and, more significantly, Mr. Lensbouer's harassment stopped." (ECF No. 42 at 22). The Third Circuit Court of Appeals has indeed held "that when an employer's response stops harassment, there cannot be Title VII liability." *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 294 (3d Cir. 1999) (citing *Bouton v. BMW of N. America, Inc.*, 29 F.3d 103, 110 (3d Cir. 1994) ("By definition, there is no negligence if the [sexual harassment grievance] procedure is effective.")).

Plaintiffs nonetheless argue that the County can be held liable because it was "negligent in not preventing Lensbouer's sexual harassment of [them]." (ECF No. 46 at 12). Because of the County's allegedly inadequate response to the incident involving Darryl Marker, they argue,

they were placed at an unreasonable risk of being harassed in the workplace. (ECF No. 46 at 14).

Although the Third Circuit does not appear to have directly addressed Plaintiffs' theory of negligence, other courts recognized its validity in certain circumstances. The leading decision is from the Fourth Circuit, *Paroline v. Unisys Corp.*, 879 F.2d 100, 107 (4th Cir. 1989), *rev'd in part on other grounds*, 900 F.2d 27, 28 (4th Cir. 1990) (per curiam) (en banc). In *Paroline*, the defendant received complaints that one of its employees harassed female co-workers by making inappropriate comments and inappropriately touching them. *Id.* at 103. After learning of the harassment, the employer warned the perpetrator not to engage in that type of conduct again. *Id.* Despite that, the plaintiff was harassed in a similar manner by the same individual. *Id.*

Like the Plaintiffs here, the plaintiff in *Paroline* argued that her employer "had a duty to remedy the sexual harassment after it occurred, but also had an obligation to try to prevent her harassment from occurring in the first place." *Id.* at 107. While the Fourth Circuit acknowledged that its prior cases had "focused on the adequacy of an employer's remedies *after* the harassment had occurred," it extended the logic from those cases to hold that liability may be imputed, "under certain circumstances, to an employer who failed to take steps to try to *prevent* sexual harassment of the plaintiff." *Id.* (emphasis in original). As the court explained:

> In a hostile environment case under Title VII, we will impute liability to an employer who anticipated or reasonably should have anticipated that the plaintiff would become a victim of sexual harassment in the workplace and yet failed to take action reasonably calculated to prevent such harassment. An employer's knowledge that a male worker has previously harassed female employees other than the plaintiff will often prove highly relevant in deciding whether the employer should have anticipated that the plaintiff too would become a victim of the male employee's harassing conduct …. Of course, an employer's knowledge of previous incidents of sexual harassment of other female workers will not necessarily indicate that an employer should have anticipated the plaintiff's harassment as well. But that is generally an issue for

the fact finder, not one for disposal on summary judgment.

*Id.*

Applying that standard, the court held that the plaintiff raised a genuine issue as to whether the defendant should have anticipated the harassment because the defendant "had received complaints that [the harasser] had made improper sexual overtures toward female workers" and had also asked the plaintiff a question during her interview that could be interpreted as an attempt to determine her tolerance for harassment. *Id.* at 107-08. In the court's view, a fact finder could have inferred from that evidence that the defendant should have recognized the potential for further harassment. *Id.* at 108. The court also held that the plaintiff "raised as a genuine issue as to whether the company cook action reasonably calculated to prevent the harassment" because the evidence suggested that the defendant's prior warning to the harasser "was nothing but a sham." *Id.*

The Fourth Circuit recently reaffirmed its holding in *Paroline*, making clear that "employers have an affirmative duty to prevent sexual harassment, and will be liable if they 'anticipated or reasonably should have anticipated' that a particular employee would sexually harass a particular coworker and yet 'failed to take action reasonably calculated to prevent such harassment.'" *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 255 (4th Cir. 2015) (quoting *Paroline*, 879 F.2d at 107). Nevertheless, the court in *Foster* concluded that the plaintiff failed to satisfy "the *Paroline* failure-to-warn theory" because the defendant had investigated the prior allegations of harassment and determined that they were unfounded. *Id.* at 256. Not only that, but a state human resources commission had also investigated the prior allegations and "returned a finding of 'no probable cause.'" *Id.* at 256. Thus, the court held "as a matter of law"

that "an employer may reasonably rely upon the findings of a state civil rights agency in determining whether an employee poses a risk of creating a hostile work environment." *Id.* Otherwise, the court noted, employers would have "to discipline or terminate all employees accused of harassment, regardless of whether the accusations against them are supported by evidence." *Id.*

The Second Circuit adopted a similar rule in *Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001), though that case involved facts that are far more egregious than those here. In *Ferris*, a flight attendant was raped by her co-worker during a layover. *Id.* at 130. The plaintiff reported the incident to Delta, which investigated and eventually recommended that her assailant be terminated. *Id.* at 132. During discovery, it was learned that three other flight attendants had reported similar incidents to Delta years before the plaintiff was raped and that Delta had not responded. *Id.* at 132-34. In assessing whether Delta could be held responsible for the rape, the Second Circuit focused on Delta's knowledge of the prior incidents:

> A reasonable factfinder might conclude that Delta's negligence made it responsible for [the plaintiff's] rape. Delta had notice of [the assailant's] proclivity to rape co-workers. The fact that [the assailant's] prior rapes were not of [the plaintiff] but of other co-workers is not preclusive. If an employer is on notice of a likelihood that a particular employee's proclivities place other employees at unreasonable risk of rape, the employer does not escape responsibility to warn or protect likely future victims merely because the abusive employee has not previously abused those particular employees.

*Id.* at 136. The court cautioned, however, that "[t]he more egregious the abuse and the more serious the threat of which the employer has notice, the more the employer will be required under a standard of reasonable care to take steps for the protection of likely future victims." *Id.*

Similarly, the Tenth Circuit endorsed the rule from *Paroline* in *Hirase-Doi v. U.S. West*

*Communications, Inc.*, 61 F.3d 777, 783 (10th Cir. 1995), *superseded on other grounds by Faragher* 524

U.S. at 775. Framing the issue as one of constructive notice, the court held that an employer

"may be put on notice if it learns that the perpetrator has practiced widespread sexual

harassment in the office place, even though [it] may not have known that this particular

plaintiff was one of the perpetrator's victims." *Id.* But, the court noted, "[t]he extent and

seriousness of the earlier harassment and the similarity and nearness in time to the later

harassment should be factors in deciding whether to allow the evidence of harassment of others

to prove notice."[5] *Id.* at 783-84.

In *Longstreet v. Illinois Department of Corrections*, however, the Seventh Circuit rejected an

argument akin to the one advanced by Plaintiffs. 276 F.3d 379, 382 (7th Cir. 2002). In that case,

the plaintiff was harassed by two co-workers, Bester and Bills. *Id.* at 381. She reported both

incidents, and Bester resigned in lieu of being fired, while Bills was ordered to stay away from

the plaintiff. *Id.* Despite the defendant's seemingly adequate response to her harassment, the

plaintiff argued that the defendant could be held liable because it "was negligent . . . in not

preventing the harassment in the first place." *Id.* Noting that her harassers had "harassed others

before her," she argued that if the defendant "had taken reasonable steps in connection with

those prior incidents," she would not have been harassed.

The Seventh Circuit disagreed, finding that "[t]he facts" did "not support [the plaintiff's]

theory" because "[t]he prior incidents on which she relie[d] did not show that the [defendant]

---

[5] The Supreme Court also recently explained, albeit in dicta, that a plaintiff could "prevail by showing
that his or her employer was negligent in failing to *prevent harassment from taking place.*" *Vance v. Ball State
Univ.*, 133 S. Ct. 2434, 2453 (2013) (emphasis added). "Evidence that an employer did not monitor the
workplace, failed to respond to complaints, failed to provide a system for registering complaints, or
effectively discouraged complaints from being filed would be relevant." *Id.*

was negligent in its previous dealings with [her harassers]." *Id.* at 382. In one prior incident, the court observed, Bester offered a co-worker "$100 to 'suck his d*ck' and $200 to have sex with him." The co-worker reported that incident, and Bester was re-assigned and never allowed to work with the co-worker again. *Id.* As a result, the harassment ceased, and, the court noted, "even [the harassed co-worker] was satisfied with the resolution of her case." *Id.* "The only other evidence of prior incidents consist[ed] of vague hearsay allegations that both Bester and Bills harassed other women in some way but" none of those alleged incidents was ever reported. *Id.*

The Seventh Circuit considered the first incident "the only prior incident with any potential legal meat" since the only evidence of the other incidents was hearsay. *Id.* In assessing the defendant's response to that incident, the court, wary of "litigating [the co-worker's] situation in Longstreet's case," determined that "there is little to be said about it except that the [defendant's] response was not obviously unreasonable." *Id.* at 382. "It would push the role of deterrence too far," the court explained, "to say that a response which seemed to be within the realm of reasonableness in one situation can, if ultimately it did not have the proper deterrent effect, be the sole basis for liability in another case even if the employer's response in the second case was clearly sufficient." *Id.* Therefore, while recognizing the "superficial appeal" of the plaintiff's argument, the court refused to impose "what amounts to strict liability for every second incident of harassment committed by an employee, especially when the first incident was far less serious than the second." *Id.* The court noted, however, that the result might have been different if "Bester's acts toward [the co-worker had] been more severe—and as a result he had merely been reassigned to another duty station." Or if there were "actual nonhearsay

complaints that he harassed several other women, and that despite complaints he had not been disciplined[.]" *Id.* at 383.

This case is more like *Paroline* than *Longstreet*. Based on the evidence in the record, Plaintiffs have created a genuine issue of fact as to whether the County should have anticipated that Lensbouer would harass another co-worker, after being put on notice of his behavior by Darryl Marker. The incidents involving Marker and Plaintiffs were strikingly similar. Lensbouer made inappropriate comments towards all three women, and, on at least one occasion, was alleged to have physically groped them while alone with them in a room. The incidents also happened in fairly quick succession: Lensbouer received the written reprimand for the Marker incident in March 2010, and allegedly turned his attention to Plaintiffs soon thereafter. Marker notified the County of Lensbouer's behavior, and during its investigation, the County learned that at least one other woman, Jessica Rogers, had been subjected to inappropriate comments by Lensbouer. Even after the investigation of Marker's complaint, however, Lensbouer continued to engage in "sexual banter." As Bauer testified at her deposition, Lensbouer "may have slowed down. I mean, we all probably did after [Marker's complaint] because we were aware but, you know, eventually it probably started all over with everyone, not just him." (ECF No. 44-13 at 54:7-10). Viewing this evidence in the light most favorable to the Plaintiffs, it could be inferred that the County should have known that other female employees at the jail could be at risk of being harassed unless it took remedial action.

A reasonable juror could also conclude that the County "failed to take action reasonably calculated to prevent" future harassment following Marker's complaint. *Foster*, 787 F.3d at 255. Although Lensbouer was directed to attend a sexual harassment training class, it is undisputed

that he never actually attended the class. It is also undisputed that no one ever followed up with him about it. The County also, at times, allowed Lensbouer to continue working the same shifts as Marker. Although Marker complained about that arrangement, she did not believe that her complaints were taken seriously. From this evidence, a reasonable juror could conclude that the County's response to the Marker incident was nothing more than a "sham." *Paroline*, 879 F.2d at 108. At the very least, a reasonable juror could find that the County was negligent in failing to follow up with Lensbouer about whether he completed the sexual harassment class he was required to attend.  Thus, the Court cannot say, as a matter of law, that the County's response to the Marker incident was reasonable, as was the case in *Longstreet*. Unlike in that case, there is evidence to suggest that the County did not adequately address the prior complaint of harassment because it did not even follow through with the discipline that it purported to impose.

Since Plaintiffs have established a sufficient evidentiary basis for imposing liability on the Court for the alleged harassment, as well as the other elements of their *prima facie* case, Defendant's motion for summary judgment as to this claim will be denied.

**B.      Retaliation**

Plaintiffs do not dispute that they cannot make out a *prima facie* case of retaliation against the County. Accordingly, this aspect of the County's motion will be granted.

**C.      Section 1983**

The County argues that it is entitled to summary judgment on Plaintiffs' § 1983 claims because these claims are subsumed by their Title VII claims. It is true that a plaintiff cannot seek to enforce rights created exclusively by Title VII through § 1983. *See Williams v. Penn. Human*

*Relations Comm'n*, No. CV 14-1290, 2016 WL 6834612, at *13 (W.D. Pa. Nov. 21, 2016) (discussing *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Assoc.*, 453 U.S. 1, 20 (1981)); *West v. City of Bethlehem*, No. CIV.A. 11-1194, 2011 WL 5105381, at *7 (E.D. Pa. Oct. 26, 2011) (citing *McLaughlin v. Rose Tree Media Sch. Dist.*, 1 F. Supp. 2d 476, 479 (E.D. Pa. 1998)). However, "'the comprehensive scheme provided in Title VII does not preempt section 1983' claims when the plaintiff has a separate constitutional basis, apart from the rights created by Title VII, upon which the § 1983 claim rests." *West*, 2011 WL 5105381, at *7 (quoting *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1079 (3d Cir. 1990)). So, when a plaintiff alleges conduct that violates both rights secured by the constitution and Title VII, "discrimination claims may be brought under either statute, or both." *Bradley*, 913 F.2d at 1079 (citing *Scott v. Univ. of Del.*, 601 F.2d 76, 79 n.2 (3d Cir. 1979)). That is true even if the claims are based on the same facts, as long as "an independent constitutional basis exists for [the plaintiff's] § 1983 claim." *West*, 2011 WL 5105381, at *7.

Here, Plaintiffs have alleged a separate constitutional basis for their § 1983 claim: they allege that Lensbouer's conduct violated their right to bodily integrity secured by the Fourteenth Amendment's due process clause and that the County should be held liable because it was deliberately indifferent "toward male employees' sexual harassment of female employees …." (ECF No. 13 ¶ 67). Although "sexual harassment claims brought under § 1983 are traditionally analyzed in the context of the Equal Protection Clause, . . . the substantive component of the Due Process Clause may also come into play when a plaintiff alleges that her bodily integrity was violated by a state actor." *Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014) (citing *Wudtke v. Davel*, 128 F.3d 1057, 1062 (7th Cir. 1997)). Thus, Plaintiffs' § 1983 claims

are not subsumed by their Title VII claims. Because the County has not raised any other arguments with respect to Plaintiffs' § 1983 claims,[6] the Court is constrained to allow it to proceed at this time.

## VII.  Conclusion

For the foregoing reasons, Defendant's motion for summary judgment is granted in part and denied in part. To wit, the motion is granted insofar as it relates to Plaintiff's retaliation claim, which Plaintiff has agreed to withdraw, and denied in all other respects. An appropriate Order follows.

---

[6] The Court notes that to impose individual liability on Lensbouer under § 1983, Plaintiffs will have to show that he acted "under color of law" when the alleged harassment took place. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). That might be a high hurdle for Plaintiffs to overcome in light of their concession that Lensbouer was not their supervisor. *See Ottman v. City of Indep., Mo.*, 341 F.3d 751, 762 (8th Cir. 2003) ("When the alleged harassment does not involve the use of either state authority or position, courts have declined to find co-workers liable under section 1983."); *Brown v. N.Y. State Dep't of Corr. Servs.*, 583 F. Supp. 2d 404, 412 (W.D.N.Y. 2008) ("Harassment by a state employee's coworkers . . . typically will not satisfy the state action requirement."). Because the issue of Lensbouer's liability has not been raised, though, the Court expresses no opinion on this issue. Even if Lensbouer was not acting under color of law when the harassment took place, such a finding will not affect Plaintiffs' ability to impose liability on the County for its *own* conduct (i.e., if its policy or custom caused the alleged constitutional violation), since the County was "incontestably acting under color of state law." *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 724 (3d Cir. 1989).

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JANINE DONALDSON and** | ) |
| **KIMBERLY MCKENZIE,** | ) |
| | ) **CIVIL ACTION NO. 15-63** |
| **Plaintiffs,** | ) |
| | ) **JUDGE KIM R. GIBSON** |
| **v.** | ) |
| | ) |
| **RONALD LENSBOUER** | ) |
| **and SOMERSET COUNTY,** | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

**NOW**, this 18th day of May 2017, upon consideration of Defendant Somerset County's

motion for summary judgment (ECF No. 41) and for the reasons set forth in the Memorandum

Opinion accompanying this Order, it is **HEREBY ORDERED** that Defendant's motion for

summary judgment (ECF No. 41) is **GRANTED IN PART** and **DENIED IN PART**. To wit, the

motion is granted insofar as it relates to Plaintiff's retaliation claim, which Plaintiff has agreed

to withdraw, and denied in all other respects.

BY THE COURT:

Kim R. Gibson
United States District Judge